IN THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE
DISTRICT OF ALABAMA, NORTHERN DIVISION

RECEIVED

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| MARK FREDERICK | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case Number: 2:07-cv-00602-WHA-TFM |
| | * | |
| CITY OF MONTGOMERY, et al., | * | |
| Defendants. | * | |
| | * | |

PLAINTIFF'S RESPONSE TO THE DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

COMES NOW, the Plaintiff, by and through his undersigned counsel and responds to the Defendant's motion for summary judgment and prays that the same is denied based on the following facts and case law and that the moving party has failed to meet their burden and the none moving party says as follows:

I. FACTS

The City of Montgomery noticing system is grossly ineffective and shows a blatant disregard for civil rights. They use a system of noticing and application of law in order to deliberately confuse the public and to hide their intent of taking property without just compensation. *Ellis v. City of Montgomery*, 460 F.2d Supp.,1301. For, instance in this present action they use state law in particular §11-40-32 Code of Alabama, ordinance 10-2001 and the International Property Maintenance Code of the City of Montgomery. Each providing different procedural and noticing requirements that often frustrates the process and lures property owners into a scheme designed to deprive them of their civil rights and property. None of the above municipal ordinances provide a cohesive definition of what is unsafe and each provide for different characterizations of appropriate procedure. This allows the City of Montgomery to use any or all of the

above in conjunction with state law to take property and violate the civil rights of individuals.

The relevant facts are clear and are undisputed.    The Plaintiff appealed a demolition order of the City Council for the City of Montgomery on September 16, 2005 to the Montgomery County Circuit Court.    Sometime during this action on June 29, 2006 Eva Bank foreclosed on the property.    Thereafter on July 26, 2006 Dewayne N. Morris and Mayor Bobby Bright entered into an agreement to tear down Jasmine Garden Apartments for the sum of $35,0000.    Finally, on August 29, 2006 the Honorable Judge Price, pursuant to a stipulation for entry of Judgment set aside an order to demolish structures.

## II. ARGUMENT

### A.  Tort Claims Are Not Barred

The law is clear as it relates to claims presented under this action.    In dealing with the Defendants contentions that the plaintiff's tort claims are time barred because of the failure of the plaintiff to comply with Ala. Code §11-47-23, §11-47-192 (1975), plaintiff asserts that he has complied.    In particular compliance under these statutes when it comes to notice means presentment.    It is important in reading this section to understand what is meant by "presentment." Bringing the action within the six-month period is presentment. Anderson v. City of Birmingham, 177 Ala. 302, 50 So. 256 (1959).    Where the plaintiff files his claim with the city, he would also have to present it unless he had filed suit in court. *Id*.    The filing of suit would be notice within itself of its presentment.    Further, on being employed in any case where a claim is to be made against a city for damages, counsel should immediately file a letter with the mayor, demanding of him the names of

2

any other persons who could be liable with the city for his client's damages. Ala. Code §11-47-23, §11-47-191 (1975).  The mayor has ten days from that date to furnish the names of such persons.  And if he does not furnish such names within such period, the plaintiff may file his action and proceed as though there were none. Ala. Code §11-47-191(c) (1975).

The plaintiff has complied with the presentment portion of the above statue and his tort claims are not time barred.  On April 26, 2007 the plaintiff's counsel sent a letter to Mayor Bobby Bright for the City of Montgomery, informing him of an impending civil action and requesting him to furnish the names of such persons whom could be liable with the City of Montgomery for damages. (See Exhibit A)  The mayor failed to respond within the ten day period and the same filed suit on May 15, 2007 in the Montgomery County Circuit Court.  Therefore Plaintiff's tort claims are not barred.

B. Colleteral Estoppel and Res Judicata would not bar Recovery

In addressing the Defendant's contention that *Colleteral Estoppel* and *Res Judicata* would bar recovery of counts I, II, III, IV, and VII in the complaint, is without merit.  The Plaintiff, claims arise after the demolition and not prior to the demolition. The Defendant's counsel has made an assumption that the claims are based on acts prior to the demolition which are not supported in the complaint under the causes of action. The plaintiff claims under all counts except count I, deals with acts that occurred after the demolition and are based on federally protected rights.  The original action was an appeal pursuant to state law concerning the council's finding of an unsafe structure.  Further, the demolition of the structure was around September, 2006 after the court's ruling in August 29, 2006.

C. Plaintiff does have Standing

The defendant's argue that the plaintiff has no standing because the property was foreclosed upon prior to demolition and that they had a contract with the Eva Bank. The Plaintiff had standing prior to the demolition and thereafter because of his right or privileges to redeem the property. Plaintiff admits that the property was foreclosed upon but that he had a statutory redemption right Ala. Code §6-5-250 (1975). State law is clear as to a person's redemptive rights. The Court in Dominex, Inc. v. Key, 456 So.2d 1047 (Ala. 1984) noted that Equity of redemption is generally considered to be a "property right." The statutory right of redemption from foreclosure, on the other hand, is a personal right or privilege though it has the appearance of being a mere statutory extension of an equitable right:

Although, the statutory rights of redemption given or conferred by this article are mere personal privileges and not property or property rights. These privileges may be exercised in the mode and manner prescribed by statute and can not be waived in a deed of trust, judgment, or mortgage, or in any agreement before foreclosure or a execution sale. Further, the right of privilege conferred under this article would not be subject to levy and sale under execution or attachment nor is it subject to alienation except in the cases provided for under this article; but if the right or privilege is perfected by redemption as provided in this article, then, and not until then, it becomes property or rights of property subject to levy, sale, alienation, or other disposition. There is however, no prohibition against the assignment of this right in a quitclaim deed, so long as it is expressly assigned or granted to the person attempting to exercise the right to redeem. Daugherty Assocs. v. Silmon, 535 So.2d 135 (Ala. 1988).

4

D. <u>42 U.S.C. § 1985(3) and Standing</u>

As such, the Plaintiff's right or privilege of redemption was a protected right in which the City of Montgomery and later Eva Bank conspired to abridge by demolishing the structures in which the plaintiff had a right to redeem, denying the plaintiff equal protection under the laws. This was accomplished after the Montgomery County Circuit Court made it's ruling on August 29, 2006. The Mayor of the City of Montgomery by entering into an illegal and a voidable contract with Eva Bank, discounted demolition fees by almost $200,000 in order to cut off completely any remaining rights the plaintiff might have in the structures. The City of Montgomery knew said acts were voidable because they were without the authority of the council of the City of Montgomery and in direct contradiction of  state law Ala. Code §11-45-2,3 (1975).   Further, the City of Montgomery own ordinance 10-2001(E)  provides that, ". . . .The fixing of said costs by the City Council shall constitute a special assessment against the lot or lots, parcel or parcels of land upon which the building or structure was located, and, thus made and confirmed, shall constitute a lien on said property for the amount of such assessment," upon demolition of an unsafe building.

In the above paragraph the plaintiff has addressed two of the prongs also necessary to prove his claim under 42 U.S.C. § 1985(3), namely that there was a conspiracy and its purpose was to deprive plaintiff of his rights. Under <u>Trawinski v. United Technologies</u>, 313 F.3d 1295, to make a claim under 42 U.S.C. § 1985(3) the plaintiff must show the following: (1) a conspiracy, (2) for purpose of depriving, either directly or indirectly, any person or class of person of equal protection of the laws, or of equal privileges and immunities under the laws; and (3) and act in the furtherance of this

conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of citizen of the United States.

The Defendant's contentions as it relates to Plaintiff's federally based claims must fail. In furtherance of this conspiracy the City of Montgomery applied various techniques in an attempt to take plaintiff's property but when this failed, they pursued a new course of action designed to cut off all his rights, including his right or privileges to redeem said property. This was done at first by leading the Plaintiff to believe that he could stop the demolition process by cooperating with city officials, in which he responded by hiring an architect, taking bids from contractors, fencing and vacating tenants. (See Exhibit B ) In a letter addressed on May 6, 2005, the Plaintiff was encouraged to renovate and upon approval the estimated cost was between $1,500,000 to $2,500,000. The City of Montgomery provided a list of alleged needed repairs only after doing a random inspection of several units in each building that was attached to the above letter. It states, "Items listed in this repair notice pertain to, but are not solely limited to violations necessary to bring all apartments and utility buildings up to current international property maintenance codes as well as local building codes." (See Exhibit C) The Plaintiff was never noticed in any of the notices required by law that he was to comply with International Property Maintenance Code but instead was informed that he was in violation of ordinance 10-2001 of the City of Montgomery and Ala. Code §11-40-32. Although, he was noticed on May 9, 2005, that certain repairs are necessary to bring this property into compliance with the International Property Maintenance Code of the City of Montgomery, his official notices as required by law contained no reference to the same. (See Exhibit D) It was never the intention of the City of Montgomery to allow for

6

rehabilitation but to demolish said structure. (See Exhibit E) The Plaintiff was given 60 days to bring a 76,000 square foot property up to code at a cost above that which the plaintiff had purchased it for almost a year and a half prior.

The plaintiff right of redemption was deprived by the conspirators by doing the following: on June 5, 2006 the plaintiff receives a letter from Dewayne N. Morris informing him of an immediate foreclosure scheduled for June 29, 2006, enclosed with this letter is a notice containing notification required by the Consumer Credit Protection Act, 91 Stat. 879; 15 U.SC. 1692(g), which allowed the Plaintiff within 30 days to dispute the debt, well into the next month past the time for the proposed foreclosure (See Exhibit F); on June 29, 2006 Eva Bank foreclosed despite the fact the plaintiff time to dispute the date had not yet expired; on July 19, 2006 Dewayne N. Morris sends the plaintiff a letter informing him, "...Our bid to remove the structures from the property is $290,000, I doubt seriously that the property has any value (See Exhibit G); on July 26, 2006 Dewayne N. Morris and Mayor Bobby Bright enter into an agreement to tear down Jasmine Garden Apartments for the sum of $35,000 (See Exhibit H); on August 29, 2006 the Honorable Judge Price, pursuant to a stipulation for entry of Judgment set aside an order to demo structures (See Exhibit I); on September 29, 2006 Eva Bank sent an expense check to the City of Montgomery Legal Office for the sum of $35,000. (See Exhibit J)

E. 42 U.S.C. § 1983

The Plaintiff other federal claim is crouched under 42 U.S.C. § 1983. Under *Wideman v. Shallowford Community Hosp, Inc.*, 826 F.2d 1030, 1032 (11th Cir.1987), the litigants have the burden of alleging two elements with some factual detail: "(1) that they

suffered a deprivation of rights, privileges or immunities secured by the Constitution and 'laws' of the United States," and (2) that a person "acting under color of law" caused the deprivation, either by an act or omission.   The major crux of the Defendant's argument as to why this claim must fail is that the Plaintiff had no ownership rights at the time of demolition and the same had adequate notice.

This fails as it relates to both arguments.  The plaintiff's counsel notes that the Defendant's counsel adequately articulated the City of Montgomery feelings concerning this property, when he states in his argument, "The City of Montgomery and all of its agents became contractors at this time and in the best interest of the Citizenry of the City of Montgomery deemed that it was proper to abate the nuisance on the property." This is despite the fact the Defendant's have argued that the Plaintiff prevailed in circuit court and the City of Montgomery demolition order was held for naught.  In essence the City of Montgomery did not consider what the state law, municipal or otherwise, proscribed the Plaintiff's property was a defacto nuisance by their own custom and practices.  Further, this same property under the current administration and prior to the plaintiff purchasing it from a local landowner, was in worst condition and had received no demolition notices. It was their intent to deprive the plaintiff of his property and they conspired to do so by stalling the process and when this failed, they interfered with his right of redemption by denying him equal protection under the law.  The City of Montgomery knew that after their failure in circuit court that they would be compelled to start the process all over again, in order to effectuate their scheme in demolishing the structures.  So they lured Eva Bank into the scheme and conspired with the same by offering discounted fees, under color of state law to cut off the Plaintiff's redemptive rights.  Now as a defense

8

they argue that the work was contracted and there cannot be any state action. It was the City of Montgomery, employees and equipment that demolished the plaintiff's property. Further, it was the City Officials who contracted with Eva Bank that maintain and that received the benefit of payment from Eva Bank. The City of Montgomery was clearly acting under the color of law when they demolished said structure although their attempt at camouflage shows no action other than State action. They did this clearly to deprive the plaintiff of his redemptive rights and to be treated equally under the law by circumventing the law as it relates to demolition to accomplish their purpose of demolishing the structures.

Thereby plaintiff prays that said motion for summary judgment be denied.


Norman Hurst (HUR016)
Attorney for the Defendant
617 Martha Street
Montgomery, Alabama 36104
(334) 269-6449


CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing motion was served on the following by mailing copies of same by United States First Class Mail in a properly addressed envelope with adequate postage affixed thereon to assure delivery, addressed as follows:

Honorable M. Boyle
P.O. Box 1111
Montgomery, Alabama 36101

Norman Hurst Jr. (HUR016)

# NORMAN HURST, III
## ATTORNEY AT LAW

*EXHIBIT A*

462-A Sayre Street ~ Montgomery, AL 36104 ~ Phone: (334) 269-6449 ~ (334) 398-2319 (Cell) ~ (334) 263-0491 (Fax)

April 26, 2007

Honorable Bobby N. Bright
P.O. Box 111
Montgomery, Alabama 36101

Re: *Mark Frederick/Jasmine Garden Apartments*

Dear Mayor Bright:

I have been retained by Mr. Mark Frederick to bring a civil action against the City of Montgomery and its agents for violation of his civil rights for acts stemming from the above referenced property. I ask that therefore you provide me with all names of any other persons who could be liable with the city for my clients damages and I look forward to hearing from you soon.

Yours truly,

Norman Hurst

NH/nh

September 6, 2005

Attn: Robert Black, Jr. ,
From: Mr. & Mrs. Mark Frederick
Pages: 4

We need to **STOP DEMOLITION of Jasmine Gardens Apartments**, if that is what the city's intention is for tomorrow morning, or later this week. (As you recall, *even* the newscasters present today could not interpret the rhetoric of today's city council meeting.)

My concerns with the city council of Montgomery are as follows:

1.     I have owned Jasmine Gardens Apartments for 20 months. **The buildings were in worse condition and disrepair on the date of purchase.** Since I became the owner, I have been trying to clean them up in order to provide a safe family environment for the tenants.

2.     My managers and I have made great attempts to start a neighborhood watch. We began this process 12 months ago. The city never dropped off the "Neighborhood Watch" signs which we requested repeatedly.
The police rarely responded to emergency phone calls regarding shootings, vandalism, and drug exchanges, that were made by my managers and tenants. According to my managers, the word on the street was that you could buy or sell drugs at Jasmine Gardens and the police would never show up.
Eventually, the lack of city cooperation lead to more and more vandalism and crime.

3.     In January through March 2005, several city officials, including police, were heard saying, "We'll wait until they kill each other, and then [the city] will clean it up."
These kinds of remarks were made when James, the onsite manager, would call the police to report problems. He was told this directly by a police officer when the officer showed up in response to a gun shooting and refused to arrest the suspect. The bullet of the suspect had just missed a two year old infant's head; the mother was witness to this.

4.     On April 1, 2005, I flew to Montgomery in order to meet the city council to see how the property could be improved. This was before any notices were issued by the city.

On April 1, I was told by the head building inspector at the city to bring the property up to city code if I intended to keep the existing structures. He also said as long as the process was in motion the city would work with us. He inquired how long it would take to bring the buildings up to code. I responded, "nine months."

However, during my meeting with Mr. Tim Head, city councilman, **Mr. Head stated (over five times) that he planned to demolish the buildings.**

On April 1st, after being encouraged by the head building inspector, I started the 90-day process of rehabilitating, getting contractor bids, getting architectural drawings, vacating the tenants, construction fencing, etc.

During April and May, I received bids from multiple contractors and, therefore, a contractor went to the city's building department to discuss code requirements. Obviously, the city knew that I was in the middle of the rehabilitation process.

5.     On May 9th, the city sent me **a letter stating that I had 60 days to bring the 76,000 square foot property up to code, and included a 10-page summary list of repairs needed.** 60 days in an unfair and impossible deadline.

6.     Last week, the architectural drawings were completed. The architect and I approached the city and were told that they would not give us a permit to begin construction because they were planning to vote to demolish the buildings on September 6th.

7.     During the city council meeting today, the city refused to let me donate the property (4 acres) and standing buildings to FEMA to help the recent victims of the hurricane.

I met with FEMA in Montgomery yesterday afternoon, and have been in touch with them all week, in order to set up the property for the victims. FEMA is interested in the property; Jasmine Gardens is on a waiting list for consideration. By the city insisting upon immediate demolition, FEMA, and the homeless/jobless victims are denied shelter.

8.    Also, at today's city council meeting, I was not allowed to finish speaking. I was cut short before I could describe the above incidences.

9.    Suspiciously, today's vote for demolition was not listed on the council's docket for the meeting. I know this due to a reporter from one of the local stations who checked the agenda before he interviewed me last night. He stated that the city council docket didn't list anything about Jasmine Gardens.

Today, when we showed up, Jasmine Gardens was listed as the final item on the docket, #21 out of 21 items. It appeared to be typed in at the last minute. Why wasn't the vote of Jasmine Gardens demolition listed on the docket? Why would the council try to hide this vote from reporters and others who regularly check the dockets for sensitive issues?


Are these grounds for a lawsuit? I believe so. The above are just a quick sketch of the games that the city council has put me through. If you concur, **proceed immediately and direct the lawsuit at Mr. Tim Head and the City Council of Montgomery, Alabama.** I need compensation if the city plans to tear down Jasmine Gardens Apartments.

However, let me know if you think we cannot win this suit, because that will make the rezoning nearly impossible. **Call me first to discuss.**


Most Sincerely,

Mr. Mark Frederick
Cell phone: ~~619-549-3733~~  858.504.0864
~~Home~~ phone: 858-756-~~2252~~ 1807



# City of Montgomery, Alabama

*Dorian D. Brunson*
*Inspections Department*

*Bobby N. Bright*
*Mayor*

<u>Montgomery City Council Members</u>

| | | |
|---|---|---|
| Charles W. Jinright—President | Cornelius Calhoun | Glen O. Pruitt, Jr. |
| James A. Nuckles—Pro tem | Tim Head | Martha Roby |
| Willie Cook | Janet Thomas May | Jim Spear |

May 6, 2005

Mr. Mark Fredrick
3910 Highland Drive
Carlsbad, California 92008

RE:    JASMINE GARDEN APARTMENTS

Dear Mr. Fredrick,

An inspection of the Jasmine Garden Apartments was conducted May 3, 2005 by the City of Montgomery Inspections Department and the Montgomery Fire Department.

Please find attached a list of code violations from each inspection division. Several units in each building were inspected at random. To determine absolute code compliance, plans for renovations should be submitted to Mr. Jerry Russell, Building Plans Coordinator with the Building Division. Upon approval of the plans, a building permit is required. It is our preliminary estimate that the cost of renovation will be between $1,500,000 and $2,500,000.

If I can be of further assistance, please call me at (334) 241-2080.

Sincerely,

Dory Brunson, CBO
Director, Inspections Department

JASMINE GARDEN

Items listed in this repair notice pertain to, but are not solely limited to violations necessary to bring all apartments and utility buildings up to current international property maintenance codes as well as local building codes.

EXTERIOR:

1. Buildings shall have approved numbers placed in a position to be plainly legible and visible from the street or road frontage.
2. Roofing needs to be replaced in its entirely. Repair or replace all deteriorated roof decking as needed.
3. Replace all rotted wood.
4. Canopies located above exterior doors have deteriorated or broken loose and need to be replaced or removed.
5. Exterior doors are deteriorated and need replacing. All doors must be in sound condition, weather tight and in good working order, complete with hardware. Dead Bolt locks shall be designed and installed in such a manner as to be operable inside of the dwelling unit without the use of a key, too, combination there of or any other special knowledge or effort.
6. Windows show deterioration and need replacing. All new windows must meet current fire code standards for size and materials and must conform to standards required by fire rescue. Windows must be capable of being held in place by window hardware.
7. Exterior siding is cracked, broken or missing, needs replacing. Installation of new exterior wall covering must comply with EPA/FEMA regulations governing existing asbestos siding. All siding shall be water tight as well as trim around the perimeter of windows and doors. Paint exterior of buildings in its entirety. Decay resistant woods are exempt from protective coating.

Interior:

1. Ceilings, walls and floor covering are broken, cracked or missing. Needs to be replaced and painted in its entirety.
2. Replace all deteriorated structural members as needed.
3. Interior doors shall fit well and be in good working condition, complete with hardware.
4. Install waterproof floor coverings in all kitchens and bathrooms.
5. Kitchens shall be provided with a kitchen sink, cooking appliance and refrigeration facilities, Food preparation area shall contain suitable space and equipment to store, prepare and serve foods in a sanitary manner. Provide a ventilation system to comply with local codes.
6. Bathroom shall be provided with a water closet, lavatory, bathtub and shower and shall be supplied with hot and cold running water in accordance with the international plumbing code. Ventilation shall comply with local codes.
7. Handrails must be firmly fastened, in sound condition and capable of supporting normally imposed loads.

Other:

1. Install smoke detectors in accordance with the international fire code.
2. Hot water heaters shall be properly installed and capable of providing adequate amounts of water to every sink, lavatory, bathtub, shower and laundry facility at a temperature of not less than 110° F (43° C). Tank installation must comply with local plumbing codes.
3. All plumbing, heating and electrical systems must comply with international codes.
4. Infestation and termite damage is present and must be eliminated by approved processes that will not be injurious to human health.
5. Doors, windows or hatchways for all apartments shall be provided with devices designed to provide security for the occupants and property within.
6. Refrigerators and similar equipment may not be discarded, abandoned or stored on the premises without first removing doors.
7. All trim & moldings to be installed & fitted properly (interior & exterior)

The following is a list of violations found by the Inspections Department. They are divided up by Building Division, Electrical Division, Plumbing/Gas/Mechanical Division, Housing Code Division and the Montgomery Fire Department.

## BUILDING DIVISION

1. Structural damage is a major concern because areas of walls, floors and ceilings, which were exposed, were found to have significant termite damage. However, the extent of damage cannot be determined until entire structure is exposed.
2. Other structural damage has occurred as a result of exposure to the weather and leaking. Water has made some of the ceiling and wall members deteriorate.
3. Exterior egress windows from bedrooms do not meet the current size criteria of the building code.
4. Several smoke detectors were not working properly and several were missing.
5. The headroom of the stairways is too low and several of the steps were weak. In addition, the winders (steps) do not comply with current code criteria.
6. Exterior siding materials are damaged and missing. Exposure to the weather has allowed structural elements to deteriorate. Some of the buildings have asbestos siding exteriors. Any disturbance of this material should be as directed by the Department of Environmental Management.

## ELECTRICAL DIVISION

1. Smoke detectors missing or in need of repair
2. Meter enclosures damaged
3. Cables not strapped properly
4. Light fixtures down or damaged
5. Electrical outlets damaged and covers missing
6. Circuits overfused
7. Grounded outlets installed on ungrounded circuits
8. Numerous violations on wiring to outside AC units on rear buildings
9. Repair all exterior light fixtures

Some of the violations found on individual units are:

Laundry:
Meter socket damaged, Smoke detector, open wiring at window louver

Unit 517:
Lamp cord wired from fixture, fixture damaged, Smoke Detector, cover plates missing, circuits doubled up in panel, one screw in panel cover, Seal entrance cable and secure cables and weatherhead

Unit 2908:
Damaged light fixture, Smoke detector, receptacle covers missing

Unit 2916:
Grounded outlet on ungrounded circuit, No outdoor light, Smoke detector, Damaged light fixture, Circuit overfused

Unit 507:
No Smoke Detector, Ground receptacle on ungrounded circuit, Damaged meter center, Strap ground conductor and exterior cables

Unit 2911:
Fixture damaged, Smoke Detector

Unit 2921:
Damaged outlet at AC, Damaged switches, Smoke Det., Open wiring at furnace

Unit 2923:
Damaged meter centers, Strap cables, outlet not secured to box, No main breaker in panel, Grounded outlet on ungrounded circuit, Outlet covers, Smoke Detector

Unit 2938:
Fuse protection bypassed on AC units, Disconnects damaged, Outlet covers, Smoke Detector

Unit 2941:
Outlet covers, Blank knock out at panel, Smoke detector, Repair wiring to AC's and disconnects

Unit 2953:
Repair wiring to AC's and disconnects

Unit 2965:
Cover on service disconnect damaged, Repair AC wiring

Unit 2966:
Smoke Detector, Bath fan

Unit 2958:
GFI not testing or setting, No bath fan or fixture covers

Unit 2967:
Smoke detector, covers, etc.

Unit 2957:
Outlet covers, open wiring in walls (check for damage)

Unit 532:
Correct wiring to AC's, Strap cables, open wiring, fixtures damaged, Smoke Detector

Unit 536:
Damage to wiring and equipment as a result of fire

Unit 542:
Kitchen fixture damaged, Fixture covers, Smoke Detector

Unit 546:
Receptacle broken, Outlet cover missing, Smoke detector

Unit 530:
Smoke Detector, Exterior lights & covers, Correct wiring to AC's and disconnects

Unit 512:
Fixtures Damaged, Meter center damaged, Correct wiring to AC's and disconnects

Unit 2933:
Grounded outlet on ungrounded system, circuit overfused, meter equipment damaged, strap cables

Unit 2925:
Damaged meter center, Damaged exterior cables, secure exterior cables, remove interior surface wiring, open wiring

This is not a total list of electrical code violations, which exist on this property. This report was compiled from a two hour inspection of only a few units at this entire property. All code violations or rewires of these buildings are required to be made by a licensed electrical contractor and inspected by this department.

## PLUMBING/GAS/MECHANICAL DIVISION

The apartments located between Ann Street and Dewanee, with Thrasher Street and Althe Street as the north and south border. The office is located on Thrasher Street. Not one of the apartments will pass the standards of the International Code 2003, for Plumbing and Gas. These are some of the things that will need to be upgraded.

Office and launder mat has five (5) gas pipes that are open and uncapped. These gas lines are 2 psi and present a potential life threatening hazard.   With no Public toilets.

All older buildings in the complex have gas piping under the slabs that do not meet the gas code.

517 Ann Street – Water leaks from upstairs bath
                T&P line is PVC and not to code
                Furnace and Water Heater vents are not to code
                Gas lines are open and not capped
                Gas lines are running under the slab
                Clogged heat exchanger in wall mounted vented heater
                Fan is stopped up and the vent needs to be tested for proper operation

507 Ann Street – Water Heater vent not to code
                T&P line not to code
                Uncapped Gas lines in the building
                Gas lines are running under the slab
                Vented heater needs to be cleaned of debris
                Vent requires testing

2902 Althe Street - T&P line not to code
                Gas lines are running under the slab
                Unvented wall heater is only source of heat.  This is prohibited by code.

2916 Althe Street –Water Heater vent not to code
                Gas lines are open
                Gas lines are running under the slab
                Wall-mounted heater is irreparable and needs to be replaced.
                Bathroom needs mechanical ventilation.

2922 Althe Street - Water Heater vent not to code
                Gas lines are open
                Gas lines are running under the slab
                Wall mounted heater requires replacement.

2911 Thrasher Street-Wall mounted vented heater require replacing

2921 Thrasher Street – Water Heater missing 2lb regulator not to code
            Wall mounted vented heater needs replacing

2941 Thrasher Street-New heating system to be installed

2949 Thrasher Street-New heating system to be installed

2957 Thrasher Street – 2lb gas regulator not to code
            Open gas lines that require proper capping
            Heating system has been removed. New system is required.
            Bathroom fan is missing

530 Dewanee Street – No water heaters are installed in the up stair apartment
            2lb regulator not to code
            No safety pan under cooling coil

532-541 Dewanee Street – Open gas lines
            2lb regulator not to code

536 – Dewanee Street – Apartment Burned. All systems will need to be repaired or
            replaced.

540 – Dewanee Street - Water heater broken
            Water heater vent is unattached

# HOUSING CODE DIVISION

**EXTERIOR:**
1. Building shall have approved numbers placed in a position to be plainly legible and visible from the street or road frontage.
2. Roofing needs to be replaced in its entirety. Repair or replace all deteriorated roof decking as needed.
3. replace all rotted wood.
4. Canopies located above exterior doors have deteriorated or broken loose and need to be replaced or removed.
5. Exterior doors are deteriorated and need replacing. All doors must be in sound condition, weather tight and in good working order, complete with hardware. Dead bolt locks shall be designed and installed in such amanner as to be operable inside of the dwelling unit without the use of a key, too, combination there of or any other special knowledge of effort.
6. Windows show deterioration and need replacing. All new windows must meet current fire code standards for size and materials and must conform to standards required by fire rescue. Windows must be capable of being held in place by window hardware.
7. Exterior siding is cracked, broken or missing, needs replacing. Installation of new exterior wall covering must comply with EPA/FEMA regulations governing existing asbestos siding. All siding shall be water tight as well as trim around the perimeter of windows and doors. Paint exterior of buildings in its entirety. Decay resistant woods are exempt from protective coating.

**INTERIOR:**
1. Ceilings, walls and floor coverning are broken, cracked or missing. Needs to be replaced and painted in its entirety.
2. Replace all deteriorated structural members are needed.
3. Interior doors shall fit well and be in good working condition, complete with hardware.
4. Install waterproof floor covering in all kitchens and bathrooms.

5.  Kitchens shall be provided with a kitchen sink, cooking appliance and refrigeration facilities, food preparation area shall contain suitable space and equipment to store, prepare and serve food in a sanitary manner. Provide ventilation system to comply with local codes.
6.  Bathrooms shall be provided with a water closet, lavatory, bathtub and shower and shall be supplied with hot and cold running water in accordance with the International Plumbing Code. Ventilation shall comply with local codes.
7.  Handrails must be firmly fastened, in sound condition and capable of supporting normally imposed loads.

OTHER:
1.  Install smoke detectors in accordance with the International Fire Code.
2.  Hot water heaters shall be properly installed and capable of providing adequate amounts of water to every sink, lavatory, bathtub, shower and laundry facility at a temperature of not less than 110˚ F (43˚ C). Tank installation must comply with local plumbing codes.
3.  All plumbing, heating and electrical systems must comply with international codes.
4.  Infestation and termite damage is present and must be eliminated by approved processes that will not be injurious to human health.
5.  Doors, windows and hatchways for all apartments shall be provided with devices designed to provide security for the occupants and property within.
6.  Refrigerators and similar equipment may not be discarded, abandoned or stored on the premises without first removing the doors.

# FIRE DEPARTMENT

1. Improper smoke detector protection.

NFPA 101, 2003 Edition, Section 30.3.4.5.1 states: Approved single-station smoke alarms shall be installed in accordance with 9.6.2.10 outside every sleeping area in the immediate vicinity of the bedrooms and on all levels of the dwelling unit, including basements

NFPA 101, 2003 Edition, Section 30.3.4.5.2 states: In buildings other than those protected throughout by an approved, supervised automatic sprinkler system installed in accordance with 30.3.5, approved single-station smoke alarms shall be installed in every sleeping room in accordance with 9.6.2.10.

NFPA 101, 2003 Edition, Section 9.6.2.10.1 states: Where required by another section of this *Code*, single-station and multiple-station smoke alarms shall be in accordance with *NFPA 72®*, *National Fire Alarm Code®*. System smoke detectors in accordance with *NFPA 72®*, *National Fire Alarm Code®*, and arranged to function in the same manner as single-station or multiple-station smoke alarms shall be permitted in lieu of smoke alarms.

NFPA 101, 2003 Edition, Section 9.6.2.10.2 states: Smoke alarms, other than battery-operated devices as permitted by other sections of this *Code*, or battery-operated devices complying with 9.6.1.3 and the low-power wireless system requirements of *NFPA 72®*, *National Fire Alarm Code®*, shall receive their operating power from the building electrical system.

NFPA 101, 2003 Edition, Section 9.6.2.10.3 states: In new construction, where two or more smoke alarms are required within a dwelling unit, suite of rooms, or similar area, they shall be arranged so that operation of any smoke alarm shall cause the alarm in all smoke alarms within the dwelling unit, suite of rooms, or similar area to sound, unless otherwise permitted by the following:
(1)   The requirement of 9.6.2.10.3 shall not apply where permitted by another section of this *Code*.
(2)   The requirement of 9.6.2.10.3 shall not apply to configurations that provide equivalent distribution of the alarm signal.

NFPA 101, 2003 Edition, Section 9.6.2.10.4 states: The alarms shall sound only within an individual

dwelling unit, suite of rooms, or similar area and shall not actuate the building fire alarm system, unless otherwise permitted by the authority having jurisdiction. Remote annunciation shall be permitted.

2. Improper Means of Escape from some sleeping areas.

NFPA 101, 2003 Edition, Section 30.2.1.2 states: Means of escape within the dwelling unit shall comply with the provisions of Section 24.2 for one- and two-family dwellings.

NFPA 101, 2003 Edition, Section 24.2.2.1.1 states: In dwellings or dwelling units of two rooms or more, every sleeping room and every living area shall have not less than one primary means of escape and one secondary means of escape.

NFPA 101, 2003 Edition, Section 24.2.2.1.2 states: A secondary means of escape shall not be required where one of the following conditions are met:
(1)    The bedroom or living area has a door leading directly to the outside of the building at or to grade level.
(2)    The dwelling unit is protected throughout by an approved automatic sprinkler system in accordance with 24.3.5.

NFPA 101, 2003 Edition, Section 24.2.2.2 states: The primary means of escape shall be a door, stairway, or ramp providing a means of unobstructed travel to the outside of the dwelling unit at street or ground level.

NFPA 101, 2003 Edition, Section 24.2.2.3 states: The secondary means of escape, other than existing approved means of escape, shall be one of the means specified in 24.2.2.3(A) through 24.2.2.3(C).
(A) It shall be a door, stairway, passage, or hall providing a way of unobstructed travel to the outside of the dwelling at street or ground level that is independent of and remote from the primary means of escape.
(B) It shall be a passage through an adjacent nonlockable space, independent of and remote from the primary means of escape, to any approved means of escape.
(C)* It shall be an outside window or door operable from the inside without the use of tools, keys, or special effort and shall provide a clear opening of not less than 0.53 $m^2$ (5.7 $ft^2$). The width shall be not less than 510 mm (20 in.), and the height shall be not less than 610 mm (24 in.). The bottom of the opening shall be not more than 1120 mm (44 in.) above the floor. Such means of escape shall be acceptable where one of the following criteria are met:
(1)    The window shall be within 6100 mm (240 in.) of grade.
(2)    The window shall be directly accessible to fire department rescue apparatus as approved by the authority having jurisdiction.
(3)    The window or door shall open onto an exterior balcony.
(4)    Windows having a sill height below the adjacent ground level shall be provided with a window well meeting the following criteria:
    (a)    The window well shall have horizontal dimensions that allow the window to be fully opened.
    (b)    The window well shall have an accessible net clear opening of not less than 0.82 $m^2$ (9 $ft^2$) with a length and width of not less than 915 mm (36 in.).
    (c)    A window well with a vertical depth of more than 1120 mm (44 in.) shall be equipped with an approved permanently affixed ladder or with steps meeting the following criteria:
        i.    The ladder or steps shall not encroach more than 150 mm (6 in.) into the required dimensions of the window well.
        ii.    The ladder or steps shall not be obstructed by the window.
(D) Ladders or steps that comply with the requirements of 24.2.2.3(C) (4) (c) shall be exempt from the requirements of 7.2.2.

3. Apartments with stairs have improper width, headroom and winders.

NFPA 101, 2003 Edition, Section 30.2.2.3.1 states: Stairs complying with 7.2.2 shall be permitted.

NFPA 101, 2003 Edition, Section 30.2.2.3.4 states: Winders complying with 7.2.2.2.4 shall be permitted within a single dwelling unit.

NFPA 101, 2003 Edition, Section 7.2.2.1.1 states: Stairs used as a component in the means of egress shall conform to the general requirements of Section 7.1 and to the special requirements of this 7.2.2 unless otherwise specified in 7.2.2.1.2.

NFPA 101, 2003 Edition, Section 7.2.2.1.2 states: The requirement of 7.2.2.1.1 shall not apply to the following:
(1)    Aisle stairs in assembly occupancies as provided in Chapter 12 and Chapter 13
(2)    Approved, existing noncomplying stairs

NFPA 101, 2003 Edition, Section 7.2.2.2.1 states: Stairs shall meet the following criteria:
(1)    New stairs shall be in accordance with Table 7.2.2.2.1(a).
(2)*   Existing stairs shall be permitted to remain in use, provided that they meet the requirements for existing stairs shown in Table 7.2.2.2.1(b).
(3)    Approved existing stairs shall be permitted to be rebuilt in accordance with the following:
        (a)    Dimensional criteria of Table 7.2.2.2.1(b)
        (b)    Other stair requirements of 7.2.2
(4)    The requirements for new and existing stairs shall not apply to stairs located in industrial equipment access areas where otherwise provided in 40.2.5.2.

Table 7.2.2.2.1(a)  New Stairs

| Feature | Dimensional Criteria |
|---|---|
| Minimum width clear of all obstructions, except projections not more than 114 mm (4 ½in.) at or below handrail height on each side | 1120 mm (44 in.); 915 mm (36 in.) where total occupant load of all stories served by stairways is fewer than 50 |
| Maximum height of risers | 180 mm (7 in.) |
| Minimum height of risers | 100 mm (4 in.) |
| Minimum tread depth | 280 mm (11 in.) |
| Minimum headroom | 2030 mm (80 in.) |
| Maximum height between landings | 3660 mm (144 in.) |

NFPA 101, 2003 Edition, Section 7.2.2.2.4.1 states: Where specified in Chapter 12 through Chapter 42, winders shall be permitted in stairs, provided that they meet the requirements of 7.2.2.2.4.2 and 7.2.2.2.4.3.

NFPA 101, 2003 Edition, Section 7.2.2.2.4.2 states: New winders shall have a tread depth of not less than 150 mm (6 in.) and a tread depth of not less than 280 mm (11 in.) at a point 305 mm (12 in.) from the narrowest edge.

NFPA 101, 2003 Edition, Section 7.2.2.2.4.3 states: Existing winders shall be permitted to be continued in use, provided that they have a tread depth of not less than 150 mm (6 in.) and a tread depth of not less than 230 mm (9 in.) at a point 305 mm (12 in.) from the narrowest edge.

NFPA 101, 2003 Edition, Section 7.2.2.4.1.1 states: Stairs and ramps shall have handrails on both sides, unless otherwise permitted in 7.2.2.4.1.5 or 7.2.2.4.1.6.

NFPA 101, 2003 Edition, Section 7.2.2.4.4.1 states: New handrails on stairs shall be not less than 865 mm (34 in.) and not more than 965 mm (38 in.) above the surface of the tread, measured vertically to the top of the rail from the leading edge of the tread.

NFPA 101, 2003 Edition, Section 7.2.2.4.4.3 states: The height of required handrails that form part of a guard shall be permitted to exceed 965 mm (38 in.), but shall not exceed 1065 mm (42 in.), measured vertically to the top of the rail from the leading edge of the tread.

NFPA 101, 2003 Edition, Section 7.2.2.4.4.6 states: Handrails shall include one of the following features:
(1)   A circular cross section with an outside diameter of not less than 32 mm (1¼ in.) and not more than 51 mm (2 in.)
(2)*  A shape that is other than circular with a perimeter dimension of not less than 100 mm (4 in.), but not more than 160 mm (6¼ in.), and with the largest cross-sectional dimension not more than 57 mm (2¼ in.), provided that graspable edges are rounded so as to provide a radius of not less than 3.2 mm (⅛ in.)

NFPA 1010, 2003 Edition, Section 7.2.2.4.4.7 states: New handrails shall be continuously graspable along their entire length.

NFPA 101, 2003 Edition, Section 7.2.2.4.4.8 states: Handrail brackets or balusters attached to the bottom surface of the handrail shall not be considered to be obstructions to grasp ability, provided that the following criteria are met:
(1)   They do not project horizontally beyond the sides of the handrail within 38 mm (1½ in.) of the bottom of the handrail and provided that, for each additional 13 mm (½ in.) of handrail perimeter dimension greater than 100 mm (4 in.), the vertical clearance dimension of 38 mm (1½in.) is reduced by 3.2 mm (⅛ in.).
(2)   They have edges with a radius of not less than 0.25 mm (0.01 in.).

NFPA 101, 2003 Edition, Section 7.2.2.4.4.9 states: New handrail ends shall be returned to the wall or floor or shall terminate at newel posts.

NFPA 101, 2003 Edition, Section 7.2.2.4.4.11 states: Within dwelling units, handrails shall extend, at the required height, to at least those points that are directly above the top and bottom risers.

NFPA 101, 2003 Edition, Section 7.1.5.1 states: Means of egress shall be designed and maintained to provide headroom in accordance with other sections of this Code, and such headroom shall be not less than 2285 mm (90 in.), with projections from the ceiling not less than 2030 mm (80 in.) nominal above the finished floor, unless otherwise specified in 7.1.5.1.1 and 7.1.5.1.2.

NFPA 101, 2003 Edition, Section 7.1.5.2 states: The minimum ceiling height shall be maintained for not less than two-thirds of the ceiling area of any room or space, provided that the ceiling height of remaining ceiling area is not less than 2030 mm (80 in.).

NFPA 101, 2003 Edition, Section 7.1.5.3 states: Headroom on stairs shall be not less than 2030 mm (80 in.) and shall be measured vertically above a plane parallel to and tangent with the most forward projection of the stair tread.

4. All apartment addresses are not marked properly.

NFPA 1, 2003 Edition, Section 10.13.1.1 states: New and existing buildings shall have approved address numbers placed in a position to be plainly legible and visible from the street or road fronting the property.

NFPA 1, 2003 Edition, Section 10.13.1.2 states: Address numbers shall contrast with their background.

NFPA 1, 2003 Edition, Section 10.13.1.3 states: Address numbers shall be Arabic numerals or alphabet letters.



# City of Montgomery, Alabama

*Dorian D. Brunson*
*Inspections Department*

*Bobby N. Bright*
*Mayor*

<u>*Montgomery City Council Members*</u>
Charles W. Jinright—President   Cornelius Calhoun   Glen O. Pruitt, Jr.
James A. Nuckles—Pro tem        Tim Head            Martha Roby
Willie Cook                     Janet Thomas May    Jim Spear

5/9/2005

Mark Freddrick
3910 Highland Dr
Carls Bad CA 92008

Dear Mark Freddrick:

An inspection of your property at <u>2930 Althea St</u> indicates that certain repairs are necessary to bring this property into compliance with the International Property Maintenance Code of the City of Montgomery.  A list of these repairs is attached.

Unless steps are taken immediately to insure compliance with the provisions of this Code legal action could result.  All repairs must be completed within **SIXTY (60) days** from the date of this letter. Electrical and plumbing repairs must be completed by a licensed electrician or plumber.

## LOCATION OF VIOLATION

| | | | |
|---|---|---|---|
| Property | 2930 Althea St | Parcel | 03 10 2 93 13 1 .000 |
| | | Size | 318.3 X 603.3 1 |
| General Description | South East Corner Of Althea St And Ann St | Assessed Description | Ann Gardens 1 Lot A Blk # Plat Bk 035 Page 032 |

Sincerely,

Philip Johnson
Housing Code Inspector
(334) 241-2068
2005-H0462

**CERTIFIED MAIL**

HILL, HILL, CARTER, FRANCO, COLE & BLACK, P.C.

425 SOUTH PERRY STREET
MONTGOMERY, ALABAMA 36104

POST OFFICE BOX 116
MONTGOMERY, ALABAMA 36101-0116

**ROBERT C. BLACK, JR.**
Rcblackjr@hillhillcarter.com

TELEPHONE: (334) 834-7600
www.HillHillCarter.com

**WRITER'S DIRECT DIAL (334) 386-4334**
Direct Facsimile (334) 832-7419

September 7, 2005

<u>*BY TELECOPIER TRANSMISSION (760/434-3885) and U.S. MAIL*</u>

Mr. Mark Frederick
3910 Highland Drive
Carlsbad, California 92008

    Re:    <u>Jasmine Garden Apartments, Corner of Ann Street and Althea Street - Matter Before the Montgomery City Council</u>

Dear Mark:

    It was a pleasure meeting with you in person. I wish it was under better circumstances.

    As you recall, Randy Blake and I were retained on August 22, 2005 to try to come in at the last minute to attempt to salvage your plans for the remodeling of the Jasmine Gardens Apartments. You wanted us to see if we could, in the two weeks given, either change the City Council's mind or at least stall its vote on the abatement of nuisance (demolition) of the structures, which was to come before the Montgomery City Council in their meeting of September 6, 2005. We talked and/or met with several city officials, the architect Charlie Cline, your lawyer, Mr. Stephens, the city council member who initiated the action (Mr. Tim Head) among others, and finally we presented as much of your case to the City Council as the Council would allow. You were present to the City Council Meeting and you saw what happened.

    I have received your faxed letter of September 6, 2005, and I have shared that letter with Randy. In that letter, you raised several concerns of yours about the way you feel that you (and we) were treated by the City Council. You stated that you wished for us to look at the possibility of initiating legal action (i.e., a lawsuit) against Council Member Tim Head and/or the City of Montgomery.

    As we said we would, Randy Blake and I have followed up on this matter after yesterday's City Council meeting. We have spoken with the City Clerk and we have again reviewed the documents you sent us along with the City Council's documents on this matter. While we sympathize with your plight, a review of the information available to us at this time leads us to the opinion that there are no grounds to sue Council Member Tim Head personally, and that an appeal of the City Council's decision in the Circuit Court would be costly and ultimately unsuccessful. In

Mr. Mark Frederick
September 7, 2005
Page 2

addition, taking legal action in that manner could possibly result in reluctance by the city to re-zone, grant variances or make any other changes in land use that could be advantageous for you in the future. For these reasons, Randy and I will not be pursuing a lawsuit or any type of appeal on your behalf in this matter.

If you do not agree with our assessment, you are encouraged to consult with another attorney on the matters of your claim at the earliest time possible. Please be advised that if you wish to appeal your case, you must file the appeal in the Circuit Court of Montgomery County, Alabama within ten (10) days of the decision of the City Council, which would be on or before September 16, 2005. (See, Ala. Code § 11-40-32 (1975)).

Very truly yours,

Robert C. Black, Jr.

RCBJR/rcbjr

# L A N D M A R K
## I N T E R N A T I O N A L   I N V E S T M E N T S, L. P.

9/15/05

TO : DOYLE FULLER

HERE is MY LETTER TO ~~RANDY~~ & ROBERT
& ~~FAX~~ ROBERTS LETTER TO ME.
(SORRY I DIDN'T GET IT OUT THIS MORNING)

~~AS~~
PLEASE NOTE APPEAL DEADLINE DATE
OF 9/16/05.

I TRUST YOU GOT THE $ WIRE.
THANKS FOR YOUR HELP.

—MARK

**MARK FREDERICK**

**P.O. Box 615    Rancho Sante Fe, CA  92067**
**phone: (619) 549-3733    fax: (858) 756-2807**
**landmarkfrederick@sbcglobal.net**

*LAW OFFICES*

# MORRIS & LAVETTE

A PROFESSIONAL CORPORATION

DEWAYNE N. MORRIS
morrisdn@bellsouth.net
JOHN R. (JACK) LAVETTE
jlavette@bellsouth.net

2131 THIRD AVENUE NORTH
P.O. BOX 11412
BIRMINGHAM, ALABAMA  35202-1412

TELEPHONE  (205) 254-3885
FAX         (205) 716-3108
e-mail:mandlpc@bellsouth.net

June 5, 2006

Mr.  Mark Frederick
P.O. Box 615
Rancho Sante Fe, CA 92067-0615

     Re:     Mortgage to EvaBank
            Acct No:  80184837

Our client, EvaBank, has on this date forwarded to us the above captioned mortgage loan for immediate foreclosure proceedings due to the delinquency of your mortgage loan.

We will forward a notice of mortgage foreclosure sale to **The Montgomery Independent** for publication of the said foreclosure sale to appear in its issues of June  8, 15, 22,  2006.  Please note that the foreclosure sale will be June 29, 2006, at the main entrance of the Montgomery County Courthouse, Montgomery, Alabama.  Enclosed please find a copy of the mortgage foreclosure notice as it will appear in **The Montgomery Independent.**

Enclosed herewith is a written notice containing notification required by the Consumer Credit Protection Act, 91 Stat. 879; 15 U.S.C. 1692(g),

If you have any questions, please let us know.

Sincerely yours,

Dewayne N. Morris

DNM/fg
Enclosures
cc:     Mr. Mark Frederick
         3910 Highland Drive
         Carlsbad, CA 92008-3511

         EvaBank via fax

NOTICE TO CONSUMER AS REQUIRED BY
CONSUMER CREDIT PROTECTION ACT
91 STAT. 879; 15 U.S.C. 1692G


NOTICE TO:

      Mr. Mark Frederick
      P.O. Box 615
      Rancho Sante Fe, CA 92067-0615

FROM:    Dewayne N. Morris
           Attorney for EvaBank

DATE:    June 5, 2006

(l) You are now in default for payments due on your note and mortgage. In addition to this arrearage, you owe or may owe costs and expenses provided for in the note and mortgage, including but not limited to publication expense, attorney's fees, accrued late charges, inspection fees, appraisal fee, ejectment costs and expenses, and title expense.

(2) The name of the creditor to whom you are indebted is EvaBank.

(3) Unless you, within thirty (30) days after receipt of this notice, dispute the validity of this debt, or any portion thereof, the debt will be assumed to be valid.

(4) If you notify me in writing within thirty (30) days from the date of this notice that the debt set out herein, or any portion thereof, is disputed, then I will obtain verification for you of the debt, and I will mail you a copy of such verification.

(5) EvaBank is the original creditor.

(6) This notice is an attempt to collect a debt, and any information obtained will be used for that purpose.

cc:    Mr. Mark Frederick
       3910 Highland Drive
       Carlsbad, CA 92008-3511

## MORTGAGE FORECLOSURE NOTICE

Default having been made in the terms of that mortgage executed on December 5, 2003, by Mark Frederick, an unmarried man, to EvaBank, which said mortgage is recorded in Book 2790, Page 727, in the Probate Office of Montgomery County, Alabama, and default continuing, and by virtue of the power of sale contained in said mortgage, the following described property will be sold at public outcry, for cash, to the highest bidder, in front of the Courthouse door of said County, in Montgomery, Alabama, during the legal hours of sale on June 29, 2006:

Lot A, according to the Map of Ann Gardens Plat No. 1, being a Replat of Lots 1 through 24, Block "C", McQueens Plat, as recorded in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 35, at Page 32.

Said sale is made for the purpose of paying the mortgage debt and cost of foreclosure.

EvaBank
Mortgagee

Dewayne N. Morris
Attorney for Mortgagee
2131 Third Avenue North
Birmingham, AL 35203
The Montgomery Independent – June 8, 15, 22, 2006

*LAW OFFICES*

# MORRIS & LAVETTE

### A PROFESSIONAL CORPORATION

DEWAYNE N. MORRIS
morrisdn@bellsouth.net
JOHN R. (JACK) LAVETTE
jlavette@bellsouth.net

2131 THIRD AVENUE NORTH
P.O. BOX 11412
BIRMINGHAM, ALABAMA  35202-1412

TELEPHONE  (205) 254-3885
FAX          (205) 716-3108
e-mail:mandlpc@bellsouth.net

June 5, 2006

Mr.  Mark Frederick
P.O. Box 615
Rancho Sante Fe, CA 92067-0615

   Re:  Mortgage to EvaBank
      Acct No:  80184837

  Our client, EvaBank, has on this date forwarded to us the above captioned mortgage loan for immediate foreclosure proceedings due to the delinquency of your mortgage loan.

  We will forward a notice of mortgage foreclosure sale to **The Montgomery Independent** for publication of the said foreclosure sale to appear in its issues of June  8, 15, 22,  2006.  Please note that the foreclosure sale will be June 29, 2006, at the main entrance of the Montgomery County Courthouse, Montgomery, Alabama.  Enclosed please find a copy of the mortgage foreclosure notice as it will appear in **The Montgomery Independent.**

  Enclosed herewith is a written notice containing notification required by the Consumer Credit Protection Act, 91 Stat. 879; 15 U.S.C. 1692(g),

  If you have any questions, please let us know.

       Sincerely yours,

       Dewayne N. Morris

DNM/fg
Enclosures
cc:  Mr. Mark Frederick
   3910 Highland Drive
   Carlsbad, CA 92008-3511

   EvaBank via fax

NOTICE TO CONSUMER AS REQUIRED BY
CONSUMER CREDIT PROTECTION ACT
91 STAT. 879; 15 U.S.C. 1692G

NOTICE TO:

      Mr. Mark Frederick
      P.O. Box 615
      Rancho Sante Fe, CA 92067-0615

FROM:    Dewayne N. Morris
          Attorney for EvaBank

DATE:     June 5, 2006

    (I) You are now in default for payments due on your note and mortgage.  In addition to this arrearage, you owe or may owe costs and expenses provided for in the note and mortgage, including but not limited to publication expense, attorney's fees, accrued late charges, inspection fees, appraisal fee, ejectment costs and expenses, and title expense.

    (2) The name of the creditor to whom you are indebted is EvaBank.

    (3) Unless you, within thirty (30) days after receipt of this notice, dispute the validity of this debt, or any portion thereof, the debt will be assumed to be valid.

    (4) If you notify me in writing within thirty (30) days from the date of this notice that the debt set out herein, or any portion thereof, is disputed, then I will obtain verification for you of the debt, and I will mail you a copy of such verification.

    (5) EvaBank is the original creditor.

    (6) This notice is an attempt to collect a debt, and any information obtained will be used for that purpose.

cc:    Mr. Mark Frederick
      3910  Highland Drive
      Carlsbad, CA 92008-3511

## MORTGAGE FORECLOSURE NOTICE

Default having been made in the terms of that mortgage executed on December 5, 2003, by Mark Frederick, an unmarried man, to EvaBank, which said mortgage is recorded in Book 2790, Page 727, in the Probate Office of Montgomery County, Alabama, and default continuing, and by virtue of the power of sale contained in said mortgage, the following described property will be sold at public outcry, for cash, to the highest bidder, in front of the Courthouse door of said County, in Montgomery, Alabama, during the legal hours of sale on June 29, 2006:

Lot A, according to the Map of Ann Gardens Plat No. 1, being a Replat of Lots 1 through 24, Block "C", McQueens Plat, as recorded in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 35, at Page 32.

Said sale is made for the purpose of paying the mortgage debt and cost of foreclosure.


EvaBank
Mortgagee

Dewayne N. Morris
Attorney for Mortgagee
2131 Third Avenue North
Birmingham, AL 35203
The Montgomery Independent – June 8, 15, 22, 2006

LAW OFFICES

# MORRIS & LAVETTE

### A PROFESSIONAL CORPORATION

DEWAYNE N. MORRIS
morrisdn@bellsouth.net
JOHN R. (JACK) LAVETTE
jlavette@bellsouth.net

2131 THIRD AVENUE NORTH
P.O. BOX 11412
BIRMINGHAM, ALABAMA 35202-1412

FED TAX ID   63-0958610
TELEPHONE  (205) 254-3885
TOLL FREE  (800) 466-3885
FAX      (205) 716-3108

July 19, 2006

Mr. Mark Frederick
P.O. Box 615
Rancho Santa Fe, CA 92067-0615

     Re:    EvaBank v. Yourself
           Acct # 80184837

Dear Mark:

     Enclosed are two sheets, printouts from EvaBank.

     You will note that the principal balance of your mortgage loan with EvaBank was $928,479.75 after your last payment of $8,877.71 made on March 13, 2006. On June 30, 2006, EvaBank applied the roof money, plus interest to the account reducing the outstanding balance to $851,839.62. Although the next item applied to your account is in the amount of $223,359.87, the correct amount should be $300,000.00, as that was the bid price that EvaBank bid at the foreclosure sale. Hence, the unpaid principal balance after the foreclosure sale and the application of the roof money is $551,839.62, plus interest from June 30, 2006. Any insurance money that we collect will further reduce the outstanding balance. Also, if the foreclosed property is sold for more than redemption costs ($300,000.00, plus interest and expenses) you will get credit for that sum. Our bid to remove the structures from the property is $290,000.00, I doubt seriously that the property has any value.

     The $551,839.62 may be a number that you will be able to pay, over time. If you are willing to begin liquidating this debt voluntarily, you will avoid the collection process through the courts. EvaBank would like some collateral for the debt, such as second mortgages on real estate in which you have equity.

     Please let us know whether or not you are in a position and are willing t voluntarily begin to liquidate the debt.

     Sincerely yours,

     Dewayne N. Morris

DNM:smg

SEE FEDERALLY MANDATED NOTICE ON PAGE 2

STATE OF ALABAMA            )
                           )
COUNTY OF MONTGOMERY        )

## AGREEMENT

THIS AGREEMENT is made and entered into this 26th day of July, 2006, by **EVABANK by and through its CEO and majority share holder, DEWAYNE N. MORRIS** and the **CITY OF MONTGOMERY**, a Municipal corporation.

1.      EvaBank by and through its CEO and majority share holder, Dewayne N. Morris, hereby agrees to allow the City of Montgomery to tear down, and demolish, the property located at Lot A, according to the Map of Ann Gardens Plat No. 1, being a Replat of Lots 1 through 24, Block "C", McQueens Plat, as recorded in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 35, at Page 32. (This property is also referred to as Jasmine Garden Apartments). ("Property")

2.      EvaBank has agreed to pay the sum of ($35,000.00) in a certified check made payable to the City of Montgomery for the demolition of said property. This amount shall be paid in full within (30) days upon demolition of property.

3.      This Agreement constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property. It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants and conditions herein set forth, and that no modification of this Agreement and no waiver of any of its terms and conditions shall be effective unless made in writing and duly executed by the parties hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by its officers thereunto duly authorized as of this 26th day of July, 2006.

DEWAYNE N. MORRIS
(CEO AND MAJORITY SHAREHOLDER FOR EVABANK)

BOBBY N. BRIGHT, MAYOR
CITY OF MONTGOMERY, ALABAMA

FILED
CIRCUIT COURT OF
MONTGOMERY COUNTY

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

2006 AUG 30  AM 8: 39

**MARK FREDERICK**            )
                             )
Plaintiff,                   )
                             )
vs.                          )
                             )   CASE NO:  CV-2005-2408-PR
**CITY OF MONTGOMERY**        )
                             )
Defendant.                   )
                             )

### ORDER

Based upon the stipulation for entry of Judgment in this case, it is the

ORDER, JUDGMENT and DECREE OF THIS Court that the Order of

Demolition of the City Council of the City of Montgomery dated September 6,

2005, which ordered the demolition of the property located at Ann Street and

Althea Street, and commonly known as Jasmine Gardens Apartments, is hereby

held to be invalid, is hereby set aside and held for naught.

The costs of this proceeding are hereby taxed against the City of

Montgomery.

DONE this the 29th day of August, 2006.

_____
CIRCUIT JUDGE

EXHIBIT J

Page 5 of 5     Filed 06/15/2008     Document 21-4     Case 2:07-cv-00602-WHA-TFM

REMITTER: EVA BANK

**EVA Bank**
1710 Cherokee Ave., S.W.
Cullman, AL 35055

025163

DATE  9/29/06        **EXPENSE CHECK**        ACCOUNT NUMBER        4820

Thirty five thousand dollars

AMOUNT   ***35,000.00

P
AY
TO
THE
ORDER OF

CITY OF MONTGOMERY LEGAL OFFICE
MICHAEL D BOYLE
103 NORTH PERRY STREET
MONTGOMERY  AL  36104

AUTHORIZED SIGNATURE                    MP

⑉025163⑉ ⑉062203719⑉:000 42640⑉

| CITY OF MONTGOMERY LEGAL OFFICE | | | | Vendor Number | 4820 |
| INVOICE NO | DATE | AMOUNT PAID | GL ACCOUNT | DESCRIPTION | |
| SEP 2006 | 9/29/06 | 35,000.00 | 70000793
| CHECK AMOUNT - | | 35,000.00 | | | |

70000793 ORE DEMOLITION 80184837/M

*Mark Fredrick property*

*From: Dewayne Morris*

*Given to Engineering Department*